## CHISHOLM–RYDER CO., Inc., v. BUCK.
### No. 1896.

District Court, D. Maryland.
July 30, 1932.

A. P. Greeley, of Washington, D. C., and Preston A. Pairo, of Baltimore, Md., for plaintiff.

Melville Church, of Church & Church, and C. B. Des Jardins, both of Washington, D. C., and H. Beale Rollins, of Baltimore, Md., for defendant.

CHESNUT, District Judge.

### Findings of Fact.

(1) Urschel patents, Nos. 1,256,491 and 1,256,492, were issued on February 12, 1918, to a partnership of Cadiz, Ohio, known as

Chisholm-Scott Company, without in any way identifying the partners composing such partnership on that date.

(2) Urschel patent, No. 1,336,991, was issued on April 13, 1920, to William E. Urschel, and assigned by him on May 15, 1920, to a partnership of Columbus, Ohio, known as Chisholm-Scott Company, without in any way identifying the partners composing said partnership on May 15, 1920.

(3) In October and November, 1925, an instrument (plaintiff's Exhibit No. 17) was executed by C. Kate Chisholm, W. A. Chisholm, L. A. Chisholm, Bessie L. Bissing, Emelda B. Chisholm, Thomas A. Scott, and Susie P. Scott, purporting to assign to Chisholm-Ryder Company, Inc., a corporation of the state of New York, all right, title, and interest of the assignors in and to Urschel patents, Nos. 1,256,491, 1,256,492, and 1,336,-991. This instrument refers to the signers as "the several partners of the Chisholm-Scott Company, formerly of Cadiz, Ohio, now of Columbus, Ohio."

(4) There is no direct evidence that the persons who executed said assignment to Chisholm-Ryder Company, Inc., were partners in the partnership known as Chisholm-Scott Company on February 12, 1918, or May 15, 1920, and no direct evidence of the transfer of any interest in and to said patents to any of said persons, but there is some slight evidence from which it may be inferred that the persons executing the said assignment were substantially all of the persons entitled thereto, and there is evidence of the continued user and control of all said patents by the plaintiff and its predecessor in title for ten years or more without adverse claim.

(5) There are three prior United States patents in evidence, Thompson, No. 1,058,-116, April 8, 1913, Carnochan and Damon, No. 1,113,307, October 13, 1914, and Schroeder, No. 1,116,930, November 10, 1914, which establish that, prior to Urschel, it had been proposed to provide machines for snipping automatically the ends from bean pods. In these prior machines, the bean pods, either individually or in groups, were received in pockets in a rotary member, and the ends were snipped as the rotary member carried them into engagement with knives, the amount of snipping being determined by gage plates.

(6) The prior United States patent of Bailey, No. 190,180, May 1, 1877, in evidence, discloses a machine for snipping portions from kernels of grain, such as oats. In this machine, the kernels of grain are fed into a drum having a perforated wall, and, as the kernels are tumbled by the rotation of the drum, they enter and protrude through the perforations, engaging gage plates, which limit the amount of protrusion, and being carried against the cutting edges of knives, which sever the protruding portions of the kernels. The perforations in the wall of the drum flare inwardly, thus facilitating the entry of the ends of the kernels into the perforations.

(7) The prior United States patent of Thorpe, No. 241,249, May 10, 1881, in evidence, discloses a machine for snipping portions from kernels of oats. In this machine, there are a series of wheels having peripheral flanges in which there are inwardly flaring perforations, and a set of knives arranged adjacent the peripheries of these wheels. The oats are fed between the wheels, and the kernels enter and protrude through the perforations, engaging the body portions of the knives, which limit the amount of protrusion, and, while so engaged, being carried against the cutting edges which sever the protruding portions.

(8) The prior United States patent of Sanborn, No. 600,554, March 15, 1898, in evidence, discloses a machine for severing the stems or projecting ends of raisins. This machine comprises a drum having a perforated side wall, with a removable perforated cover or section, closing an opening, through which a batch of material can be placed within or removed from the drum. Arranged close to the outer surface of the drum are a pair of blades, which the patent calls scrapers or grippers. Means are provided for rotating the drum at a speed of about sixty revolutions per minute. A batch of raisins having been placed in the drum and the cover closed, the drum is set in rotation, and the rotation tumbles the raisins about, causing the stems to project through the perforations in the side wall of the drum. The projecting stems are carried against and engage the scraper or gripper blades, and are thus removed.

(9) The prior United States patent of Talley, No. 1,124,972, January 12, 1915, in evidence, discloses a machine, of the perforated drum type, for topping beets. The beets are fed into the rotating drum and tumbled therein so that the green ends project through slots in the side wall of the drum. The projecting ends engage cutting edges and are severed. It seems this machine would also sever long slim root-ends of the

beets, when they project through the slots of the drum.

(10) The prior United States patent of Burdick, No. 1,217,269, February 27, 1917, in evidence, discloses a machine, of the perforated drum type, for topping onions. The onions are fed into the rotating drum and tumbled therein so that the onion tops project through the perforations or slots in the wall of the drum, being carried by the drum into engagement with a cutter, which severs the projecting tops.

(11) The Urschel patents, Nos. 1,256,491 and 1,256,492, issued February 12, 1918, in suit, each describes fully the construction and mode of operation or function of one and the same machine for snipping the ends from string beans. This machine comprises a cylinder having a side wall perforated by a large number of slots therein. Within the cylinder, there is mounted a spiral partition plate which forms in the interior of the cylinder a spiral passageway the outer wall of which is formed by the slotted cylinder wall. The sections of the spiral partition plate are spaced from each other less than the length of a bean pod, so as to keep the bean pods crosswise of the cylinder. Upon the inner surface of the cylinder wall, there are a number of triangular bars 21 which extend parallel to each other and are spaced at a distance less than the length of the bean pod. The patents ascribe to these triangular bars 21 the functions of directing the bean pods endwise toward the slots, uprighting the bean pods, elevating the bean pods, and reversing them end for end. The bean pods are continuously fed into one end of the cylinder, entering the spiral passageway and passing therethrough to the discharge end, at which snipped beans are continuously discharged. The bean pods roll end over end upon the slotted bottom of the spiral passageway, due to the presence of the bars 21, which up-end the bean pods, directing them endwise toward the slots and reversing them so that, after one end of a bean pod has been snipped, the opposite end will be directed toward other slots in the bottom of the spiral passageway, so that it may be snipped also. Mounted close to the outer surface of the cylinder and extending longitudinally thereof there is a knife or cutter arranged to engage and sever the bean ends which may project through the slots of the cylinder wall. The amount of projection or protrusion of the bean ends is determined by the size of the slots which are of such size that only the tip end of the average bean pod will project through the slots to be snipped. As the bean pods roll end over upon the slotted bottom

of the spiral passageway, the bean ends from time to time protrude through the slots and are severed by the knife.

(12) The Urschel patent, No. 1,256,491, in suit, does not describe any method or process for snipping beans in addition to the operation or function of the bean-snipping apparatus fully disclosed in that patent and the companion patent, No. 1,256,492.

(13) The procedure which is described in the Urschel patent, No. 1,256,491, as a method or process of snipping string beans, is inseparable from the mechanism disclosed for that purpose, and is incapable of being carried out usefully by simple manipulations independently of said mechanism.

(14) The Urschel patent, No. 1,336,991, issued April 13, 1920, in suit, discloses certain improvements in the construction of the bean-snipping machine shown in the Urschel patents, Nos. 1,256,491 and 1,256,492. One of these features relates to the construction of the snipping slots. In Urschel patent, No. 1,336,991, these snipping slots are of irregular or wavy outline, consisting of a series of circular holes connected by narrow necks, as distinguished from the snipping slots of the prior Urschel patents, which had parallel edges. The machine of the prior Urschel patents employed slots which flared inwardly toward the interior of the cylinder, and in Urschel patent, No. 1,336,991, this same idea is made use of by providing inwardly flaring slots which, however, are curved in cross section, as distinguished from the slots of the prior Urschel patents, which, in cross section, had sloping sides that were straight and not curved.

(15) The defendant has made and used for profit a single machine for snipping string beans. That machine is of the batch type and comprises a drum having a perforated side wall; substantially the entire surface of this side wall being filled with circular holes, countersunk so that they flare inwardly of the drum. One section of this side wall is formed by a removable cover which is also perforated. When this cover is removed, a batch or charge of bean pods may be placed within the drum or discharged therefrom. The drum has a central shaft mounted upon bearings and driven at a speed of about 55 revolutions per minute. There are four rods extending parallel to the central shaft from one end plate of the drum to the other; these rods being equidistantly spaced from each other and located at about one-third of the distance from the side wall of the drum to the center thereof. The distance between each of these rods and the side

wall of the drum is considerably greater than the length of the average bean pod. This Buck machine has two knives for severing the tip ends from the bean pods. These knives are mounted, one above and the other below the drum, in close proximity to the surface thereof and extending longitudinally. Associated with each knife is a gage plate comprising a sheet of metal extending longitudinally of the drum and gradually sloping toward the surface of the drum. The nearest approach of the gage plate to the surface of the drum is substantially at the cutting edge of the corresponding knife. A batch of bean pods is placed within the drum and the cover section fastened in position. The drum is then rotated, and as it rotates the bean pods therein are tumbled about, with the result that from time to time bean ends project through the perforations in the wall of the drum to varying extents. The rotation of the drum brings these protruding bean ends into contact with the gage plates, which adjust them inwardly in the perforations, so that when the protruding bean ends engage a knife and are severed there will be only the limited amount of protrusion permitted by the gage plates, and, consequently, the amount snipped from the bean pods is determined by the gage plates, and not by the size of the perforations. The rotation of the drum is continued for a certain length of time, in the course of which a large percentage and possibly all bean pods will have both ends severed by the knives. The rotation of the drum is then stopped, the cover is removed and the load of snipped beans discharged from the machine.

(16) The only machine made and used by the defendant for profit is a machine of the character described in the disclaimer appearing in Urschel patent, No. 1,256,492, at lines 90–106, of page 2, that is, a machine having a drum the interior of which is quite plain and unprovided with longitudinal bars 21 or transverse plates 22, but having the parallel or longitudinal rods already referred to.

(17) The only machine made and used by the defendant for profit is substantially the same in construction and mode of operation or function as the raisin stemming and preparing machine disclosed in the Sanborn patent, No. 600,554, patented March 15, 1898. Both of these machines are of the batch type and include a perforated drum within which a batch of material is tumbled to cause portions of the material to protrude through perforations in the wall of the drum for engagement by externally located knives which sever or remove the protruding portions of the fruit or vegetables.

(18) The snipping of bean ends is analogous to the stemming of raisins, and the use of defendant's machine for the snipping of beans is the mere application of the old Sanborn machine to an analogous use.

(19) In the only machine made and used by the defendant for profit, the bean pods are not supported by the walls of the perforations against further protrusion by an amount, depending upon the taper, and severed while so supported, inasmuch as the gage plates engage and support the ends of the bean pods when they are severed having adjusted the pods inwardly in the perforations.

(20) In the only machine made and used by the defendant for profit, the bean pods are not uprighted in their downward path so as to bring them point down toward the perforations, since the Buck machine operates on the principle of tumbling the bean pods within the drum, without providing any special means to upright them, except to the extent, if any, caused by the parallel rods.

(21) In the only machine made and used by the defendant for profit, there is not employed any equivalent of the bars 21 or plates 22; that is to say, any means which are substantially the same and coact in substantially the same way to accomplish substantially the same result as the bars 21 or plates 22, or either of them.

(22) The provisions of countersunk holes in the peripheral wall of the drum, flaring inwardly of the drum, is a mechanical expedient not involving any invention at the date of the Urschel patents in suit; such countersunk holes being shown in the prior patents of Bailey, No. 190,180, and Thorpe, No. 241,249, and also in Knight's Mechanical Dictionary, published in 1874, at page 638, Defendant's Exhibit 1.

(23) The prior United States patents of Bailey, No. 190,180, Thorpe, No. 241,249, and Sanborn No. 600,554, were not cited as references or considered by the Patent Office in connection with the prosecution of the applications for the patents in suit.

Conclusions of Law.

(1) Ownership of the Urschel patents, Nos. 1,256,491 and 1,256,492, was vested by the issuance of said patents to Chisholm-Scott Company, of Cadiz, Ohio, a partnership, in those persons forming, on February 12, 1918, the date of the grant, the partnership of Cadiz, Ohio, doing business under

the firm name and style of Chisholm-Scott Company.

(2) Ownership of Urschel patent, No. 1,336,991, was vested by the assignment from Urschel on May 15, 1920, to the Chisholm-Scott Company, a partnership, with offices at 71 East State street, Columbus, Ohio, in those persons constituting, on May 15, 1920, the partnership of Columbus, Ohio, doing business under the firm name and style of Chisholm-Scott Company.

(3) The plaintiff has shown a doubtful, but on the whole, a sufficient prima facie legal ownership of the patents in suit.

(4) The Urschel patent, No. 1,256,491, is invalid because for the function or abstract effect of a machine.

(5) Claims 1 and 2 of Urschel patent, No. 1,256,491, are invalid as covering no more than the operation of the machine disclosed in the Sanborn patent, No. 600,554, applied to a purpose or use analogous to the stemming of raisins; that is, the snipping of bean pods.

(6) Claim 3 of Urschel patent, No. 1,256,-491, is not infringed by the defendant's use of the Buck machine for snipping bean pods.

(7) Claims 1 and 7 of Urschel patent, No. 1,256,492, are not infringed by the making or use of defendant's machine, because these claims cover a combination of elements including the bars 21 of the Urschel patent, and the only machine made and used by defendant for profit contains no bars 21 or any equivalent thereof.

(8) Claims 1, 2, and 3 of Urschel patent, No. 1,336,991, are not infringed by the defendant's machine.

(9) The bill of complaint should be dismissed, with costs to be paid by the plaintiff.

## Opinion.

The plaintiff sues in equity for an injunction and damages, and for accounting of profits, under United States Code, title 35, § 70 (35 USCA § 70), for alleged infringement by the defendant of three United States letters patent for the snipping of string beans. The patents in suit are No. 1,256,491, for a process for snipping string beans, issued February 12, 1918; No. 1,256,492, for apparatus (or machine) for snipping string beans, issued February 12, 1918; and No. 1,336,991, for improvement on the last-mentioned patent, issued April 13, 1920.

The defenses are as follows: (1) Insufficient proof of title in the plaintiff as to each and all of said patents; (2) invalidity of the process patent No. 1,256,491; (3) non-infringement of the apparatus or machine patent, No. 1,256,492; and (4) invalidity and noninfringement of patent, No. 1,336,991.

The plaintiff is a New York corporation with principal place of business at Niagara Falls, N. Y. The defendant is a resident of Carroll county, Md. Prior to the issuance of the patents in suit, there was no satisfactory machine for the snipping of string beans preparatory to canning. This necessary work had previously been done by hand, and was a seasonal occupation employing many persons, chiefly women and children. Under the patents in suit, the plaintiff and its predecessor in title have manufactured and sold or licensed to the canners of string beans about 1,500 machines, in consequence of which the volume of canned string beans has been increased approximately ten times in amount, with some diminution of market price. The successful introduction of this machine is a typical illustration of the change in economic and industrial conditions prevalent in the last few years due to the substitution of machinery for manual labor. Plaintiff's machines for snipping string beans are the only ones which, up to the present time, have had any commercial success. In perfection of the machine for commercial use, the plaintiff and its predecessor in title expended a large sum of money approximating $135,000, and, since the machines have been perfected and put into use, they have received returns on the investment by way of outright sales or royalties from canners in the amount of approximately $3,400,000.

The defendant is not a scientist or inventor, and, prior to the making of his machine, alleged to be an infringement of the plaintiff's patents, had only a very nominal relation to the canning industry in string beans. He was educated as a minister, but, by reason of trouble with his eyes, had to temporarily abandon his profession. During his period of substantial professional inactivity he and his children at times obtained some employment in snipping string beans by hand for a neighboring canner. He says this led him to believe that a machine could be made which would perform the work much more rapidly and economically. At that time he had no knowledge of the existence of the plaintiff's machine, and had never seen one in operation in any cannery. The machine that he has made, and which the plaintiff claims is an infringement of its patents, is, by comparison with the plaintiff's machine, obviously a very crude production, but it appears from the testimony that its efficiency in mechanical operation is approximately as great as that

of the plaintiff's much more complicated and elaborate apparatus. The defendant has not yet sold or licensed his machine, nor has he obtained any patent for it, but it is admitted by his counsel that he has made or proposes to make and sell or license his machines for profit.

It will be convenient to consider the case in the order of the defenses above mentioned.

*First. As to Plaintiff's Title.* The plaintiff claims title to the patents in suit as assignee of a partnership known as the Chisholm-Scott Company. The original inventor of the patents is one Urschel, who assigned to the Chisholm-Scott Company, a partnership of Cadiz, Ohio, his pending application for patents (serials Nos. 209727 and 209728), which resulted in the issuance of patents Nos. 1,256,491 and 1,256,492 to the said partnership. The patentee named is the Chisholm-Scott Company, of Cadiz, Ohio, a partnership. The individuals constituting this partnership at the time of the issuance of the patents were not named. Patent No. 1,336,991 was issued to Urschel directly and later assigned by him to the Chisholm-Scott Company, a partnership, of Columbus, Ohio. Again the individuals composing the partnership were not named in this assignment. On or about October 26, 1925, seven individuals describing themselves as "the several partners of the Chisholm-Scott Company, formerly of Cadiz, Ohio, now of Columbus, Ohio," assigned the three patents in suit, with others, to the plaintiff corporation.

The defendant's answer does not admit, but calls for proof of the plaintiff's title. By stipulation of counsel filed March 11, 1932, photostatic copies of the original assignments have been offered in evidence. They were duly recorded in the Patent Office. Both assignments were acknowledged before a notary public. No objection is raised as to the formalities regarding the execution or recording of the assignments nor to the proof of the papers constituting the assignments. In all these formal respects the assignments seem to comply with the requirements of section 47, title 35, of the United States Code (35 USCA § 47). The defendant however, makes and insists upon the point that there is no proof in this case as to who were the individuals composing the firm of the Chisholm-Scott Company at the time of the issuance and assignment of the said patents to the partnership, and, therefore, there is no sufficient proof that the persons who executed the last-mentioned assignment to the plaintiff and who therein described themselves as constituting the partnership of the Chisholm-

Scott Company, were in fact the same persons to whom the patents were first issued or assigned under the name of the Chisholm-Scott Company; nor is there any proof that the persons describing themselves as partners in the Chisholm-Scott Company at the time of the assignment were the successors in interest or title to the unknown persons who, under the name of the Chisholm-Scott Company first acquired title to the patents.

It is not disputed by the defendant that a patent may validly be issued to or assigned to a partnership by the partnership name alone [see Fresno Home-Packing Co. v. Fruit Cleaning Co., 101 F. 826 (C. C. A. 9); Kentucky Block Cannel Coal Co. v. Sewell, 249 F. 840, 1 A. L. R. 556 (C. C. A. 6)], but the point is made and insisted on that in the proof of the chain of title following from issuance and assignment first to and then by a partnership there must be proof submitted by the plaintiff as ultimate assignee to show that the persons named as its assignors were themselves the persons who had the ownership of the patents and the right to assign them; and that in default of such proof there is a fatal breach in the chain of title. The question involved is not at all as to the mere formal sufficiency of the assignments, but is based on the substantial point that there is absence of proof of ownership in the last assignors. Clearly, a deed or assignment of either real or personal property by A to B, followed by an assignment of the same property by C to D, would not constitute any legal proof of a good title to D, even though C in his conveyance to D recites that he is the owner of the property, or that he had previously acquired title to it, in the absence of any proof as to how C acquired his title. Such a recital is open to all the objections that apply to hearsay testimony.

The burden of proof is, of course, upon the plaintiff to establish its title to the patents. Walker on Patents (4th Ed.) §§ 495, 617; Paine v. Trask (C. C.) 56 F. 231, affirmed 56 F. 233 (C. C. A. 1); American Graphophone Co. v. National Phonograph Co. (C. C.) 127 F. 349; Wahl v. N. E. Norstron Elec. Mfg. Co. (D. C.) 19 F.(2d) 544. The plaintiff's failure to submit this additional proof said to be requisite is not merely accidental or inadvertent. The answer called for proof of the plaintiff's title. The point was urged as a defense at the trial of the case, and counsel for the plaintiff was then given the opportunity to cure the alleged defect by submitting additional testimony, if available. And still later the attention of counsel for the plaintiff was called

to his failure to submit additional proof on this point, whereupon he took the position that the plaintiff did not care to submit any additional proof, for the reason that the assignments themselves were prima facie sufficient evidence of the plaintiff's title; reference being made to section 47, of title 35, U. S. Code (35 USCA § 47), and to the case of Standard Elevator Co. v. Crane Elevator Co. (C. C. A.) 76 F. 767, 790. In my opinion the contention of plaintiff's counsel in this respect is not sound. Section 47, title 35, U. S. Code (35 USCA § 47), deals only with the formalities of execution of patent assignments and the effect of recording in the Patent Office, and provides, by the amendment of March 3, 1897, that an acknowledgment before a notary public and certain other officers "shall be prima facie evidence of the execution of such assignment, grant, or conveyance." It is contended that the "execution" of the assignment as referred to in the statute "is to be taken as necessarily implying the right to assign as well as the fact of assignment," and it may be that the discussion in the case cited lends some colorable support to the plaintiff's contention. But the point adjudicated in the case referred to was quite unlike that here presented. The court was there dealing only with the question whether certified copies of assignments from the records of the Patent Office were sufficient proof of the original assignments. Here the question is not at all as to the sufficiency of proof of the original assignments (which were in fact themselves offered in evidence), but raised the question of substantial legal sufficiency of the assignment itself as conveying title. It is also to be noted that in the case cited there was a dissent, and on the point decided there is considerable diversity of judicial decision; but we are not concerned with that question here. The exact question here presented is whether there is sufficient prima facie evidence of the plaintiff's title, and the effect contended for is that there is no proof that the assignors in the assignment to the plaintiff corporation themselves had the title to assign. The failure of the plaintiff to cure this defect, assuming that it could have been cured by supplemental proof, as would seem probable, results in presenting for decision a question which in my opinion involves some real difficulty which, however, I have determined, in view of all the circumstances, should be resolved in favor of the plaintiff, especially as on the merits of the case with regard to the patents, I have reached the conclusion that the bill must be dismissed.

The sufficiency of the plaintiff's title under the assignments is determinable as a matter of statutory patent law and decisions. Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U. S. 24, 40, 43 S. Ct. 254, 67 L. Ed. 516. It is sufficient if the plaintiff makes out a prima facie case of his title as against an alleged infringer. There is some evidence in this case from which the identity of the partners constituting the firm of Chisholm-Scott Company, to whom the patents were issued and assigned and who in turn made the assignment to the plaintiff, may be inferred. The name of the partnership was Chisholm-Scott Company. The names of the assignors to the plaintiff, who described themselves as "the several partners of the Chisholm-Scott Company, formerly of Cadiz, Ohio, now of Columbus, Ohio," are C. Kate Chisholm; W. A. Chisholm; L. A. Chisholm; Bessie L. Bissing; Emelda B. Chisholm; Thom A. Scott; and Susie P. Scott. It is thus noted that the surnames of the individual assignors correspond, with one exception, with the partnership name. Compare Kentucky Block Cannel Coal Co. v. Sewell, 249 F. 840, 844, 1 A. L. R. 556 (C. C. A. 6); 47 C. J. 756. In the testimony of Ryder, treasurer of the plaintiff, the Chisholm-Ryder Corporation, it appears that for some years prior to 1925 he had business relations as mechanical adviser with the Chisholm-Scott Company and was familiar with the holding of the patents by that partnership and the development work done on them and figures in the negotiations in consequence of which the patents were assigned for a substantial consideration to the plaintiff corporation which, in name, is in part identical with that of the Chisholm-Scott Company. It is inferential from his relation with the two companies that he must have been familiar with the personnel of the partnership of the Chisholm-Scott Company, and it is again inferable that the plaintiff corporation would not have given substantial consideration for the assignment of the patents without reasonable assurance that the parties making the assignment were the holders of the title; that is, were in fact the partners constituting the Chisholm-Scott Company. We have the further fact from the testimony of Ryder that during the whole time from the original acquisition of the patents by the Chisholm-Scott Company, it and its assignee, the plaintiff, the Chisholm-Ryder Company, have been in open and notorious use and control of the patents and spent large sums of money in the development of the machine, and have received approximately $3,400,000

as a result of royalties and sales of the machines. Plaintiff's machine is the only one in general use in the canning industry. It is true that the proof does not exclude the possibility that there may be some outstanding interest in these patents not included in the last assignment, but it is quite improbable under the circumstances stated that there is in fact any substantial outstanding interest. Under all the circumstances, I conclude that there is sufficient evidence of the substantial identification of the partners constituting the Chisholm-Scott Company to show a prima facie title to the patents in the plaintiff as against an alleged infringer who has himself submitted no contrary evidence as to the plaintiff's title.

■ *Second. The Validity of the Process Patent.* The defendant attacks the validity of this patent on the ground that it is merely a *function* of a machine which, under the well-established patent law decisions, cannot validly be made the basis of a patent. Corning v. Burden, 15 How. 252, 14 L. Ed. 683; Risdon Iron & Locomotive Works v. Medart, 158 U. S. 68, 15 S. Ct. 745, 39 L. Ed. 899; Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 53 L. Ed. 1034; Westinghouse v. Boyden Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136; Gulf Smokeless Coal Co. v. Sutton, 35 F.(2d) 433 (C. C. A. 4); Vapor Car Heating Co. v. Gold Car Heating & Lighting Co., 7 F.(2d) 284 (C. C. A. 2); Walker on Patents (4th Ed.) § 3.

■■ The cases just cited show the development in the Supreme Court of the United States of the authoritative judicial case law with regard to "process" patents. The statutory law as to what inventions are patentable is to be found in section 31, title 35, of the United States Code (35 USCA § 31), which includes the invention or discovery of "any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof." It will be noted that patents for processes are not expressly included among patentable inventions, but, to the extent that they have attained judicial approval, they are included within the term "art." The earlier cases in the Supreme Court were to the effect that valid process patents were limited to such processes as involved chemical or other similar elementary action. See Westinghouse v. Boyden Co., 170 U. S. 537, 557, 18 S. Ct. 707, 42 L. Ed. 1136. But in the later case of Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 53 L. Ed. 1034, the court expressly decided that valid process patents are not so limited, but may include methods or mechanical combinations or operations which produce new and useful results whether the machinery be old or new. A new process may be carried out by machinery, either old or new as the case may be. If it can be carried out only by a new machine which is also invented, patents may validly issue for the process and the machine separately. If the machine is old, but a new method is devised for its operation to produce new and valuable results, a patent may be validly issued for the new process. Gulf Smokeless Coal Co. v. Sutton, 35 F.(2d) 433 (C. C. A. 4). ·

■ A comparison of the claims relied on in this case for the apparatus patent and the process patent respectively, and an inspection of the plaintiff's machine in actual operation, leads me to the conclusion that what is claimed as the process patent in this case is merely the functioning of the machine. Claims 1 and 7 of the machine patent (which are alone relied on in this case by the plaintiff), being patent No. 1,256,492, are as follows:

"1. A machine for snipping string beans which comprises a supporting member to which the pods are fed having a multiplicity of apertures of a size to permit the tapered ends to protrude therethrough and to be supported by the walls of the aperture against further protrusions; means for causing the bean-ends to be directed endwise toward the apertures as the pods are fed; and a severing device to remove the protruding ends, substantially as described.

"7. A string bean snipper comprising a rotary drum into which the parts are fed provided with perforations of a size to permit the tapered bean-ends to partially protrude therethrough; a severing device to snip the protruding ends; and a reversing device to occasionally reverse the position of the beans and thereby eventually present each end, in turn, to the perforations, substantially as described."

Claims 1, 2, and 3 of the process patent (No. 1,256,491) are all in issue and read as follows:

"1. The process of snipping string beans which consists in promiscuously presenting a number of them to perforations in a surface, whereby the tapered bean ends automatically pass into and protrude through and are then supported by the walls of the perforations against further protrusion by an amount depending on the taper; in severing the protruding ends; and in continuing to present the ends of the cut and uncut beans

to the perforations, whereby the adequately cut bean-ends will not substantially protrude but the uncut bean-ends will protrude and be severed, substantially as described.

"2. The process of snipping string beans which consists in presenting a number of them to perforations in a surface thus causing the ends of the beans to extend through the perforations; severing the projecting ends; tumbling the pods to reverse them so as to project the other ends through the perforations; and repeating this procedure with severed and unsevered beans until the desired result is attained, substantially as described.

"3. The process of snipping string beans which consists in raising the pods above a perforated surface; letting them fall or tumble toward the surface; uprighting them in their downward path so as to bring them point-down toward and thus passing their ends part-way through the perforations; and in then severing the projecting ends, substantially as described."

Fig 5.

Fig 4.

Fig 6.

Fig 3.

The drawings and figures for the two patents are identical. An inspection of the plaintiff's machine shows that it consists of a partially hollow cylinder with perforations in the surface, mounted on supports in such a way that the axis of its length is higher at one end than at the other. As the cylinder revolves, the beans are fed into one end and by the interior arrangement are passed through the cylinder in a spiral channel arranged in the form of a screw and finally pass out the lower end of the cylinder after both ends of substantially all of the beans have been snipped. The width of the spiral channel is less than the length of the bean pod, and within the walls of the spiral channel are placed bars of metal of triangular shape with the base on the interior surface of the cylinder and spaced so closely together that a bean pod cannot lie at length between the bars. As the cylinder revolves, these triangular bars form pockets into which the bean pods fall with the design to be presented end-on to the holes in the surface which are large enough to permit the narrow tapering ends of the bean to be cut by the reciprocating knife on the exterior. When one end of the bean has thus been cut, the bars projecting outward from the inside surface of the cylinder support and elevate the bean until by the force of gravity it falls from the upper pocket to the lower part of the cylinder into another pocket. In falling, the uncut end of the bean is projected toward the bottom, and, falling into a pocket at the bottom, is presented end-on to the apertures in the surface and the other end thus cut off. The effect of the spiral channel is to prevent the beans from becoming wedged in a mass or batch and the functioning of the bars within the channels is to reverse the beans in falling after one end has been cut so that the other may be cut. The reversal of the bean ends in the tumbling process is the essential feature of the invention devised to promote the efficiency of the machine in cutting both ends from the beans.

The process described in patent No. 1,-256,491 is, in substance, a statement of the claims of the apparatus patent No. 1,256,492. Claim 1 of the process patent includes the feature of "promiscuously presenting" a number of beans to perforations in the surface. This phrase does not appear in the machine patent claims, but it is obvious from a description of the latter and an inspection of its operation that there are a number of beans in any one pocket which would be fall-

ing from that pocket more or less promiscuously. Not every bean has an end cut off every time it falls. It is more or less a matter of chance as to whether the uncut end in falling does protrude through the surface to be cut. But each bean as it traverses the spiral channel has many chances of having both ends cut.

The plaintiff claims that its process consists of three distinct steps: First, cutting off one end of the bean; second, reversing the bean; and, third, cutting off the other end. This, of course, is exactly what was done by hand before the successful invention of *plaintiff's machine*. Plaintiff's counsel admits this process is not novel, and therefore not patentable, but contends that this process patent No. 1,256,491 is based on this broad process differentiated by features which are not disclosed in the prior art which gives the claims novelty necessary to validity, and refers to the features of "promiscuous" presentation of the beans in claim 1, "tumbling" the beans in claim 2, and "uprighting" them in their downward path in claim 3, as the distinctive novel features of the process. But, as has been pointed out, these differentiations are the essential features of the function of the plaintiff's machine. There is admittedly nothing new in the process of cutting one end of the bean, reversing the bean, and then cutting off the other end. By manual labor this is a slow process, and what was needed in the industry was a machine to perform this process rapidly and efficiently. The plaintiff's machine is a new invention and has accomplished this, but the process itself is old.

Even if the process patent were construed to be broader than the functioning of the plaintiff's particular machine, it is still not new in view of the prior art. On March 15, 1898, patent No. 600,554, was issued to H. S. Sanborn for a raisin stemming and preparing machine. An examination of that patent shows that its principle of operation is substantially the same as that of the defendant's machine in this case, to be hereafter more particularly described. If the plaintiff's process patent here is to be so broadly construed that it covers any machine which operates with the result of cutting off both ends of string beans in some way, then it would seem all the defendant has done in this case is to make a machine substantially on the principle of the Sanborn patent and used it for snipping beans instead of stemming raisins. It is true that raisins have a stem on only one end, but the Sanborn machine apparently would cut off both ends of raisins

if they had two instead of one. The difference therefore is immaterial. Moreover, patent No. 1,124,972, issued January 12, 1915, to E. R. Talley, covered a beet-topping machine which, it seems, could operate on both ends of the vegetable.

█ It is well settled that a patent may not validly issue merely for the application of an old process to a new subject, without any exercise of inventive faculty and without the development of any idea which can be deemed new or original in the sense of patent law. Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 494, 4 S. Ct. 220, 28 L. Ed. 222. This same principle was applied by the Fourth Circuit Court of Appeals in the case of Armstrong Seatag Corp. v. Smith's Island Oyster Co., 254 F. 821, to the tagging of oysters, where the court said, at page 823: "It has often been laid down in one form or another that using an old process for a new, but analogous, purpose, with no substantial change in result, is not invention."

With respect to novelty, it may be said that the Sanborn patent does not include the new feature in claim 3 of the plaintiff's process patent No. 1,256,491, consisting in the "uprighting of the beans in their downward path." But, as will be hereinafter more fully stated, I find no infringement of this claim No. 3 in the defendant's machine which does not contain the uprighting feature referred to. If claims 1 and 2 of the plaintiff's process patent are valid, it is not disputed by the defendant that they are infringed. But, for the reasons indicated, I reach the conclusion that the process patent as a whole is invalid, in that it is essentially only the functioning of the plaintiff's machine.

█ I am not unmindful that the issuance of a patent by the Patent Office carries with it a presumption of validity. Gulf Smokeless Coal Co. v. Sutton, 35 F.(2d) 433 (C. C. A. 4). But the weight of this presumption varies with the circumstances of the case. It is much weakened where it appears from the file wrapper that pertinent prior patents were not considered by the Examiner in proceedings on allowance of the patent in suit. International Flatstub Check Book Co. v. Young & Selden, 284 F. 831, 832 (C. C. A. 4); American Soda Fountain Co. v. Sample, 130 F. 145 (C. C. A. 3); Elliott & Co. v. Youngstown Car Mfg. Co., 181 F. 345 (C. C. A. 3). In this case the file wrapper relating to the plaintiff's patents does not disclose several patents illustrating prior

art and relevant to this case. Note Sanborn patent, No. 600,554, Bailey, No. 190,180, and Thorpe, No. 241,249.

*Third. Infringement.* Plaintiff's apparatus or machine patent No. 1,245,492 is admittedly valid. The question is, Has it been infringed? Plaintiff's machine has already been described. I will now describe the defendant's machine. It consists of a cylinder or drum somewhat shorter in length but greater in diameter than the plaintiff's cylinder. The surface or sides of this drum are perforated with holes which are larger on the inside surface of the drum than on the outside. In the center of the drum running lengthwise is an axis rod, and equally spaced about one-third the distance from the surface to the center of the drum there are four parallel rods running lengthwise of the drum. These rods are merely round metal bars approximately an inch in diameter. They may be conveniently referred to as parallel bars.

The method of operation of the defendant's machine is as follows: A batch of string beans is placed in the drum by opening a door at the top. The quantity of string beans placed within the drum in ordinary operation covers the bottom surface of the drum (which is supported so that its longer axis is parallel to the ground) and fills the space in the drum from the bottom up to about the height of the lower two of the four parallel bars. The drum is then rotated rapidly by electrical or mechanical power. Some of the ends of the string beans when placed in a batch in the machine naturally by chance protrude through the openings which, however, are not large enough to permit any substantial portion of the pod itself to protrude. As the drum is rotated, the protruding ends of the beans come in contact with knives not unlike those used in the plaintiff's machine, but arranged with gage plates so that the desired length of the end of the string bean will be cut off. As the drum rotates, the beans are naturally carried upward and fall by the force of gravity. As the holes are very numerous, by the laws of chance during the course of revolutions both ends of most of the string beans will from time to time protrude and be cut. It is apparent that the tendency of the machine is rather to carry the beans in a mass around with the rotating drum, but the rapidity of revolution is apparently such that the centrifugal force does not operate sufficiently to prevent the beans from falling from the top to the bottom. The parallel bars probably also have some effect in stirring up the mass of beans. The efficiency of the machine is more or less dependent upon the laws of chance that both ends of the beans will protrude and be cut off. When the machine has been operated a sufficient length of time, possibly ten minutes, it is stopped, the door is opened, and the beans are taken out by hand. It is said that this machine, obviously simple and crude as compared with the plaintiff's highly developed and complicated apparatus, is nevertheless efficient to cut both ends from the whole batch of string beans to the amount of over 90 per cent. It is to be noted, however, that the defendant's machine, while apparently substantially efficient in several illustrative demonstrations, has not yet been applied to actual commercial use. Whether the tests that have been made are really sufficient to demonstate its commercial utility as a substitution for the plaintiff's machine may be open to doubt. It is, however, clearly not open to doubt that the defendant's machine is a great improvement over manual labor in snipping string beans. The simplicity of the defendant's machine will, of course, enable the defendant to manufacture and sell it at a cost much lower than that of the plaintiff.

It is apparent even from superficial examination that the defendant's machine is very markedly different from the plaintiff's. It is dissimilar in appearance, and it operates on a different principle. It is a batch machine, while the plaintiff's machine is a continuous feed machine. The defendant's machine is lacking in those arrangements in the interior of the plaintiff's rotating cylinder which have already been described. The essential and distinctive feature of the plaintiff's machine is the triangular bars placed in the relatively narrow spiral channels. I find in the defendant's machine no similar arrangement and no substantial equivalent thereof.

The earlier patents illustrating the prior art are too numerous to discuss in detail in this opinion. It is sufficient to say that, as I read them, practically every feature of the plaintiff's machine has been anticipated in some way, with the exception of the interior arrangement of the cylinder comprising the spiral channel and the triangular bars. These constitute the essential novelty of the plaintiff's machine. See Skelton v. Baldwin Tool Works (C. C. A. 4) 58 F.(2d) 221, decided April 12, 1932.

In support of its claim of infringement, plaintiff relies on the existence and effect of the four so-called parallel bars in the defendant's machine. It is said that these bars

operate to stir up the mass of beans as the drum revolves, and that the beans in falling strike the bars and are thus reversed and presented end-on to the holes in the surface of the drum at the bottom, and that this is substantially an equivalent for the lifting and reversing device afforded by the triangular bars in the plaintiff's machine. It is somewhat doubtful from the testimony as to what is the defendant's purpose in using the parallel bars in his machine. Some of the plaintiff's witnesses say that the defendant at one time in explaining his machine referred to these parallel bars as "lifting" devices. The defendant says that he does not recall using this expression, and he and his expert witness contend that the bars are inserted for structural reasons and without the primary purpose of operating as claimed by the plaintiff. Certainly there is no evidence in the case to indicate that the defendant in any way copied the plaintiff's machine, because he never saw or heard of it, and a mere superficial examination of the two machines shows that the parallel bars in the defendant's machine have no similarity in appearance or arrangement to the triangular bars in the plaintiff's machine. Furthermore, as I understand the operation of the defendant's machine, these parallel bars have little or no actual effect in reversing the bean pod within the drum during the latter's revolution. The circumferential area of the parallel bars in relation to that of the whole drum is small, and the chance that any particular bean will strike one of these comparatively narrow bars in falling would seem to be small; and, if the beans do strike one of these bars in falling, it is utterly a matter of chance as to how they will be deflected with respect to the cut or uncut ends. It seems to me that such success as the defendant's machine has in operation is due purely to the fact that the number of holes in the surface of the drum in relation to the number of beans placed in a batch in the machine and the number of revolutions of the machine in any completed operation is such that by the laws of chance a large percentage of the beans have both ends cut as a result of the whole rather promiscuous operation.

In the specification for his machine patent, page 2, lines 90 to 106, Urschel said: "In order to emphasize another cardinal feature of my apparatus, I will assume for the moment, that the interior of the drum is quite plain and unprovided with longitudinal bars 21 or transverse plates 22. I find that under such circumstances the rotation of the drum will simply cause the beans to move about on the bottom, very much as does material in a rotary sieve, but that the tendency of the beans will be to lie flatwise which gives them little opportunity to have the ends directed endwise toward or to pass through the perforations. I therefore find it necessary to provide a means of directing the bean-ends endwise toward the perforations and such means I desire to claim in the broadest possible aspect."

The kind of machine seemingly disclaimed in this specification is substantially the machine that Buck has made. And it is quite similar to the Sanborn patent for a raisin stemming machine. Urschel's invention, therefore, as described in this machine patent, constituted a very definite improvement on this old type of machine. And this improvement consisted essentially in the triangular bars and spiral channels of Urschel's machine which, in the above specification, are referred to as "longitudinal bars and transverse plates," and which heretofore have been referred to by me in the description of the plaintiff's machine as "triangular bars" and "walls of the spiral channels." The defendant's machine, besides being old in its principle of construction, does not embrace either in form or in substance the essentially new features of the plaintiff's invention. I conclude, therefore, that within the well-established principles as to what constitutes patent infringement there has been no infringement in this case. Burr v. Duryee, 1 Wall. 531, 572, 17 L. Ed. 650; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 568, 18 S. Ct. 707, 42 L. Ed. 1136; Sanitary Refrigerator Co. v. Winters, 280 U. S. 30, 42, 50 S. Ct. 9, 74 L. Ed. 147; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 406, 25 S. Ct. 697, 49 L. Ed. 1100; Skelton v. Baldwin Tool Works (C. C. A. 4) 58 F.(2d) 221, decided April 12, 1932.

*Fourth. Plaintiff's Patent No. 1,336,-991.* This patent, to the extent of its claims 1, 2, and 3, in issue, was granted for an improvement in the form, shape, and arrangement of the apertures or snipping slots in the surface of the cylinder of the plaintiff's machine described in patent No. 1,256,492. In the latter patent these holes or slots in the circumference of the cylinder were indicated in the form of straight slots of equal width on the outer surface of the cylinder. In patent No. 1,336,991 and on the plaintiff's machine presented for inspection at the trial, the outer surface opening of the slots is irregular or wavy in outline, so that the width of the slots is greater at some points

than at others, and the interior surface of the slots is arranged in a cuplike formation with beveled sloping edges, all for the purpose of facilitating the protrusion of the bean ends. In claim No. 1 of this patent the orifices are described as having "tapering side walls terminated by a narrow neck at the outer cylindrical surface"; and in claim No. 2 are described as having "partially cup shaped side walls"; and in claim No. 3, as having "partially cup shaped side walls terminated by a narrow neck at the outer cylindrical surface." In comparing this with the defendant's machine, we find that the openings in the surface of the drum of the latter are on the exterior in appearance simply round holes closely spaced with flaring side walls projecting toward the interior surface of the drum. A superficial glance at the two machines shows a very material difference in appearance and arrangement of the openings. The only feature in common seems to be that the openings are wider on the interior surface than on the exterior; but this is merely the old well-known mechanical principle of a countersunk hole. And this common feature of these two machines is not uncommon in similar patented machines illustrated by the prior art, as, for instance, Bailey, No. 190,180, and Thorpe, No. 241,-249. Therefore, if this were the only feature of the plaintiff's patent which is relied on as new, it would seem very doubtful indeed if the patent is valid in view of the former art, and the defendant contends the patent should be held invalid for that reason. However, I think it unnecessary to so decide, because the arrangement of the orifices in the plaintiff's machine taken as a whole in form and arrangement, bearing in mind the particular purpose which they are to subserve in the combination, seems to me to properly involve more than a mere variation of countersunk holes. But, in my opinion, the defendant's machine does not infringe because it does not contain the combination of new form and arrangement of slots described in plaintiff's claim for this patent.

In conclusion, in consideration of this case as a whole, I have not overlooked the undoubted fact of the large commercial success of the plaintiff's invention and its very great usefulness in the industry. But, as I read the patent case law, this factor of commercial success has only a limited scope, and is weighty particularly in case of doubt as to whether an invention is a patentable novelty, and it seems to be a factor of no controlling importance in applying the principles of law as to the validity of a process patent, or as to the facts relating to the alleged infringement of an admittedly valid machine patent. McClain v. Ortmayer, 141 U. S. 419, 428, 12 S. Ct. 76, 35 L. Ed. 800; Thropp's Sons Co. v. Seiberling, 264 U. S. 320, 329, 44 S. Ct. 346, 68 L. Ed. 708; De-Forest Radio Co. v. General Electric Co., 283 U. S. 664, 685, 51 S. Ct. 563, 75 L. Ed. 1339; American Fruit Growers v. Brodgex Co., 283 U. S. 1, 51 S. Ct. 328, 75 L. Ed. 801; Christy v. Hygeia Pneumatic Bicycle Saddle Co., 93 F. 965, 969 (C. C. A. 4); International Flatstub Check Book Co. v. Young & Selden Co., 284 F. 831, 832 (C. C. A. 4).

If the defendant is able to apply the principles of a machine which is old in the art to the new use of snipping string beans and can thereby manufacture and sell to the trade a cheaper machine than the plaintiff's which will be substantially successful in commercial use in the industry of canning string beans, I see no principle of patent law which prevents him from doing so even though he substantially achieves a result which can be better and more efficiently accomplished by the more elaborate mechanical invention of the plaintiff.

I have made separately and am filing herewith with the clerk, findings of fact and conclusions of law in compliance with Equity Rule 70½.

The bill of complaint will be dismissed, with costs to be paid by the plaintiff.