## UNION SHIPBUILDING CO. v. BOSTON IRON & METAL CO.

### No. 2397.

District Court, D. Maryland.
Dec. 17, 1936.

Semmes, Bowen & Semmes (by Gaylord L. Clark), of Baltimore, Md., and Edwards, Bower & Pool (by Clifton V, Edwards), of New York City, for plaintiff.

Morton H. Rosen, of Baltimore, Md., and Herbert A. Baker, of Boston, Mass., for defendant.

CHESNUT, District Judge.

The plaintiff in this case is the owner by assignment of United States Patent No. 1,500,282, issued July 8, 1924, to Frederick C. Stauffen, on application filed March 4, 1924. The patent is entitled a "Hauling-out system for scrapping vessels and apparatus for the same." It is a modified form of the ordinary marine railway. The plaintiff is a Delaware corporation engaged principally in the business of repairing and scrapping vessels doing business in Maryland, and with a plant situated on the Baltimore Harbor. The defendant, a Maryland corporation, is engaged generally as a dealer in scrap iron and metal and has a plant for scrapping vessels also located on the Baltimore Harbor adjoining Ft. McHenry. By its bill in equity in this case the plaintiff alleges infringement of its patent by the defendant and seeks an injunction for the future and an accounting for the past. The defenses are (1) lack of invention in view of the prior art and (2) laches and estoppel. Apart from these, the infringement is admitted. The case has been submitted for final decree upon the pleadings and testimony.

It appears from the evidence that the business of scrapping steel vessels first assumed importance about the year 1923. Prior to that time such vessels as were available for scrapping were not large in number and prior to the development of the oxy-acetylene torch the labor involved in the process of scrapping was so great as to render the business unprofitable. But

as a result of the surplus shipping after the World War, and in the United States probably increased by the Washington Conference for the Limitation of Armaments in 1922, together with the then available relatively economical process of scrapping steel vessels due to the use of the acetylene torch, the business assumed substantial proportions. In 1923 the defendant had acquired by purchase a large number of obsolete or unused vessels with the intention of scrapping them, but then not having any suitable plant of its own available for the work, entered into negotiations with the plaintiff and subsequently made a contract with the plaintiff dated April 30, 1923, for the scrapping of a number of such vessels at the price of about $7.00 per ton. In the course of negotiations for this contract Herman Schapiro, the president and presumably the chief owner of the defendant corporation, conferred from time to time with Mr. Sterrett, the then president of the plaintiff's predecessor corporation and, according to the testimony of Mr. Schapiro in this case, in relation to the manner of doing the work, he called to the attention of Mr. Sterrett an economical method of hauling the vessels out of the water which he had seen in the previous year on a visit to the shipyards of Petersen & Albeck in Copenhagen, Denmark. About the same time or shortly thereafter, Mr. Sterrett conferred with Frederick C. Stauffen who was then an engineer employed by the Union Shipbuilding Company, and instructed him if possible to devise and construct a more economical device or system for hauling the vessels out of the water and scrapping them than was then customary at the plaintiff's plant. Stauffen, no longer in the employ of the plaintiff, as a witness in this case, testified that he was not advised by Mr. Sterrett in any detail as to what was desired, but only given the general instructions to construct an apparatus or system for the purpose mentioned that could be operated with more economy than the only previously available means which necessitated the use of the ordinary marine railway at the plaintiff's plant. There was no testimony to contradict Stauffen on this point, and I therefore accept it as a fact. Stauffen says that with these general instructions he immediately overnight devised the method of operation which was subsequently embraced in the patent in suit. As already indicated, it is merely a modified form of the well-known marine railway and varies from the latter chiefly in the elimination of the use of the "cradle."

For the purposes of this case, a brief but sufficient description of a marine railway is as follows: It consists of two pairs of parallel ordinary railroad tracks based on sufficiently firm foundations of concrete constructed on an inclined plane beginning on the shore and extending down into the water for the necessary depth of approximately twenty feet or more as the particular plant requires. Each pair of parallel tracks are a few inches distant from each other and the space between the two pairs is several feet. Between and resting upon each pair of the tracks a system of rollers is provided, on which rests a movable platform of substantial timbers (the cradle) which is itself level on top, but on the underneath side is provided with longitudinal members sufficiently thin to permit their resting upon the two pairs of rollers. The numerous individual rollers are spaced apart, and kept in alignment and lateral motion prevented by side frames which move with the rollers as they roll on the rails, and the cradle rolls on the rollers. After the cradle is run down the tracks into the water the ship, while still floating, is guided or steered on to the cradle and at its in-shore end is placed in the appropriate position and is then gradually drawn out of the water up the inclined plane by a cable attached to hoisting machinery, and the outshore portion of the ship, as it ceases to be buoyed up by the water, is made stationary to prevent it from falling over by the use first of keel blocks and later by bilge blocks. When the ship has been drawn entirely out of the water and is resting on the cradle it is then in condition for repairs or scrapping.

The cost of a marine railway is approximately $250,000 as a minimum, and the operation whereby a large ship is thus hauled out of the water necessitates for several days the labor of divers and is an operation which is relatively costly, and of course involves the use of the whole marine railway which represents a large capital investment. The market price for scrap iron is generally so low that there is no profit in scrapping steel vessels if the process necessitates the use of the ordinary marine railway. It was this situation which seemed to make imperative to the

parties some modified form of the marine railway for extensive use in scrapping steel vessels, in order that the cost of the operation could be brought within the bounds of profitable operation.

Schapiro says that he described in a general way to Sterrett the method for the more economical hauling of ships out of the water, when intended to be scrapped, which he had observed in Copenhagen, but did not describe the apparatus in detail. He says, however, that the essential feature of the method was to eliminate the use of the cradle by floating the vessel directly upon the rollers between the parallel tracks and then attaching the cable to the bow of the vessel and drawing it up the ways on the rollers. This is the essential feature of the Stauffen patent. Mr. Sterrett is now dead and there was no other witness to the conversation between Schapiro and Sterrett, but there is some inferential corroboration of the fact that Petersen & Albeck did use some form of a marine railway without a cradle, from their letter to the plaintiff put in evidence as Plaintiff's Exhibit No. 18.

The more economical hauling out system devised by Stauffen was promptly constructed by him at the plaintiff's shipyards and the work of demolishing the vessels as provided for in the contract of April 30, 1923, between the parties, was begun in September of that year and concluded in accordance with the contract. Several months thereafter the defendant had purchased additional ships for scrapping and Schapiro offered the work to Mr. Sterrett, the then president of the plaintiff, but they could not agree upon a price as Mr. Sterrett then wanted $12.00 per ton for the work which Schapiro says was an impossibly high price for him to pay in view of the then prevailing market for scrap metal. Schapiro determined he would have to do the work himself and proceeded to lease a plant for that purpose known then as the South Plant of the Bethlehem Steel Company, adjoining Ft. McHenry, being the same property which was subsequently acquired by the B. and O. Railroad and is now again leased and operated by the defendant. This property had been used for shipbuilding and was provided with the foundation for a marine railway on which the defendant in 1924 constructed a hauling-out system for ships substantially similar to that at the plaintiff's plant, although differing in some little detail particularly with regard to the size of the rollers used. One Muth, formerly an employe of the plaintiff, who had worked under the supervision of Stauffen and who had left the employment of the plaintiff, became an employe of the defendant and aided in the construction of the defendant's plant. The cost of the work was approximately $13,000, including several thousand dollars in repairs due to an accident. No secret was made by the defendant of its new construction and use of its hauling-out system; and the plaintiff was fully advised of its construction and operation, and in fact sent its manager and other officers to particularly inspect the apparatus. The manager, Cowles, who was in the employ of the plaintiff's predecessor from 1923 to 1932, testified that after inspecting defendant's apparatus he advised Mr. Sterrett that it was substantially similar to the plaintiff's system, and on instructions from Sterrett he gave consideration to and finally submitted to Sterrett figures which he thought would represent a fair sum as royalty which the plaintiff could fairly require the defendant to pay. There is, however, no testimony in the case, either verbal or written, that Sterrett or any one else representing the plaintiff communicated to the defendant the information that the plaintiff had patented its system or made any demand upon the defendant for the cessation of the use of the infringing device, or any request for royalty therefor, until the letter of the plaintiff to the defendant in this case dated November 22, 1933.[1] The defendant's apparatus was used by it in the scrapping of several ships during 1924 but with one of them an accident occurred to the railway which cost several thousand dollars for repairs and, according to the testimony of Schapiro, somewhat discouraged him from continuing his own operations in scrapping vessels. Thereafter the defendant, having acquired additional vessels for scrapping, negotiated a new contract with Sterrett, about the end of 1924, for the work to be done by the plaintiff at a price varying from $6.50 to $8.00 per

---

[1] In a letter from the plaintiff's new president, dated December 23, 1933—written *post litem motan*—to the defendant, the former stated that in 1924 Sterrett (now deceased) had notified Schapiro of infringement and demanded royalty. But the plaintiff has submitted no evidence in support of this apparently hearsay statement, which is contrary to Schapiro's testimony.

ton. Thereupon the defendant discontinued use of its apparatus and removed the parts to its main plant at Curtis Bay. From the latter part of 1924 until the latter part of 1928, the plaintiff continued to do the work of scrapping vessels for the defendant; but in 1929, although the defendant wished to continue the same general arrangement, Sterrett informed Schapiro that his company could not continue to do the work for the defendant because it had recently bought 45 vessels to be scrapped on its own account and the operation would require long continued exclusive use of the plaintiff's plant. This new development presented an embarrassing situation for the defendant, and Schapiro testified that Sterrett in expressing his regret said to him, "By the way, haven't you got old rollers and the old railway that you had at the South plant several years ago?" Schapiro replied, "Yes, we have got them at Curtis Bay"; and Sterrett then said, "Well, my advice to you is to go ahead and get that plant back again if it is not doing anything, put your own rollers in and haul out your own bottoms, because we won't be able to do it for you for some time to come."

Thereafter the defendant again leased the South Plant adjoining Ft. McHenry and re-installed the system that it had operated in 1924 and has continuously thereafter scrapped its own ships using the hauling-out system. It has spent over $40,000 in re-equipping and extending this leased plant, all of which was done openly and with opportunity to the plaintiff to know the facts. From 1929 to 1931 the defendant scrapped about ten vessels at its plant, but, owing to market conditions for scrap metal, the business was small for a time thereafter until the latter part of 1932 when the defendant made a new purchase of some eighteen or more vessels to be scrapped, and work thereon proceeded under pressure during 1933 without any complaint or protest from the plaintiff until its letter of November 22, 1933, in which it demanded payment of royalties for the use of the alleged infringing device for the future and an accounting for royalties for past use. The plaintiff suggests that its own inaction in the years 1929 to 1933 was due to the fact that so far as it knew, very little work was being done by the defendant in the scrapping of ships until the latter part of 1933. It appears, however, that about thirty ships had been demolished by the defendant at its Baltimore plant during these years and prior to the receipt of the plaintiff's letter. Defendant's plant was situated in the Baltimore Harbor not far from the plaintiff's plant and was open to inspection both from the water and from the land, and I am entirely satisfied from the testimony in the case as a whole that the plaintiff's officers and employes knew in a general way at least what was being done by the defendant.

*Laches and Estoppel.*—On these facts, in my opinion, the defense of laches and estoppel is satisfactorily made out by the defendant. The plaintiff had full knowledge of the defendant's use of the alleged infringing system in 1924 and made no protest and indeed at no time thereafter for nearly ten years did it even communicate to the defendant the fact that it claimed to have a patent on its modified marine railway, although the parties were in the same line of business with nearby plants and the officers and employes by virtue of their contractual relationship for many years and their general business contracts must frequently have been in conference about the general subject matter of their operations. From 1924 to 1928 the parties had very extensive mutual business dealings in the course of which the defendant paid to the plaintiff $234,000 for the demolition of thirty-one ships at the price of $6.50 to $8.00 per ton. And when the plaintiff by virtue of its own necessities had to discontinue its previous extensive and presumably profitable work for the defendant, its president advised the defendant to do its own demolishing work using the apparatus in question. Schapiro says he never learned until the plaintiff's letter of November 22, 1933, that the plaintiff claimed to have a patent on its apparatus and there is no evidence to contradict him. But even if he did know or suspect it, he could very reasonably have understood Sterrett's advice to be an implied license, if any were necessary, to reconstruct and use his own apparatus, without charge for infringement. Indeed it is fairly inferable in view of all that transpired between the parties that Schapiro in entire good faith felt at all times free to construct and use the apparatus, which in its essential economical feature was one to which his attention had first been called in 1922 on his visit to Copenhagen, and the substance

of which he in turn had communicated to Sterrett. Furthermore, after 1928, acting on the advice of Sterrett, the defendant proceeded to spend many thousands of dollars in re-equipping its plant to do its own work and did do this work openly and notoriously and with the knowledge of the plaintiff for a period of several years without the slightest protest or complaint from the plaintiff until after Mr. Sterrett's death a new president, a Mr. Patterson, for the first time after nearly ten years, claimed royalties from the defendant. Here are all the elements of an equitable estoppel in conjunction with laches attributable to the plaintiff.

In weighing the testimony in this case, to determine the facts, it is of course to be recognized that a material part of the defendant's case in support of the defense of equitable estoppel, is based on the verbal testimony of Schapiro alone without written confirmation, and without the opportunity of contradiction or qualification by testimony on the part of the plaintiff in view of the death of Mr. Sterrett. Schapiro's testimony is, however, legally admissible and is entirely uncontradicted and is not in any way impeached. The business of the Boston Iron & Metal Company is now and for years past has been a substantial one in Baltimore. The name of the Company derives from the fact that Mr. Schapiro came to Baltimore from Boston just after the Baltimore Conflagration in 1904, and shortly thereafter established the defendant's business which has been continuously maintained in substantial proportions for more than thirty years. Furthermore, I find in the evidence as a whole substantial corroboration of his testimony from the very nature and probabilities of the situation. As previously mentioned, the letter from Petersen & Albeck of Copenhagen introduced by the plaintiff furnishes some corroboration of the very inception of the whole matter as related by Schapiro. The entire lack of any notice from the plaintiff to the defendant with reference to the plaintiff's patent for nearly ten years is an established fact. And the substantially complete knowledge by the plaintiff of the defendant's activities for a period of many years is, I think, clearly proved. Although it appears that in 1924 Mr. Sterrett gave serious consideration to asking royalty payments from the defendant, there is no testimony that he ever acted thereon or made any such demand on the defendant. His failure to do so under the circum-

stances fairly gives rise to the inference that he preferred continuous profitable business relationships to possible patent litigation. And it is further inferable that when by reason of greatly increased volume of business, other than that of the defendant, Sterrett in 1929 found it necessary to cease work for the defendant and thus put the latter in a difficult if not embarrassing position with respect to the continuance of its business of handling scrapped ship materials, he freely suggested as a solution of the difficulty that the defendant do its own work and use its old apparatus which Sterrett well knew was a practical necessity if the operations of the business were to be profitable. Furthermore, it is undisputed that the defendant did at considerable expense re-install the now questioned apparatus and use it for several years thereafter without protest from the plaintiff, and the protest finally came not while Mr. Sterrett was alive but from his successor. That is to say, in summary, Schapiro's testimony is not only uncontradicted but is in no way improbable in view of the other admitted or established facts. And I do not feel justified in rejecting it merely because of the unfortunate death of Mr. Sterrett. It is not a case where the defendant is first asserting a right after the death of the other party or a material witness to a transaction, but rather the converse, where the plaintiff is asserting a right after laches for many years, and after the death of its principal executive officer who acted for it in the meantime. Nor is the case one where the testimony of Schapiro is relied upon to establish "prior use" as a separate and distinct defense to the validity of the patent. In such cases it is, of course, well established that something more would be required than purely verbal testimony of one witness. Eibel Process Co. v. Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523; Barbed Wire Patent Case, 143 U.S. 275, 284, 12 S.Ct. 443, 450, 36 L.Ed. 154; Virginia-Carolina Peanut Co. v. Benthall Machine Co., Inc., 241 F. 89, 97 (C. C.A. 4); Rokap Corporation v. Lamm, 10 F.Supp. 219, 224 (D.C.Md.), affirmed 85 F. (2d) 873 (C.C.A. 4).

Laches without estoppel may be a defense only as to accounting for the past, and not as to injunction for the future, Menendez v. Holt, 128 U.S. 514, 524, 9 S. Ct. 143, 32 L.Ed. 526; A. R. Mosler & Co. v. Lurie, 209 F. 364 (C.C.A. 2); but laches with estoppel when arising out of facts

similar or analogous to those here existing constitute a well recognized defense in patent infringement cases, both as to injunction and accounting, and have been so applied in many illustrative cases. Walker on Patents (6th Ed.) § 631, pp. 726, 727, 728; 48 C.J. § 539, p. 336; Wolf Mineral Process Corporation v. Minerals Separation North American Corporation, 18 F. (2d) 483, 490 (C.C.A. 4); Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., 284 F. 645 (C.C.A. 3); Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 64 F.(2d) 185 (C.C.A. 3); Meyer Mfg. Co. v. Miller Mfg. Co., 24 F.(2d) 505, 508 (C.C.A. 7); General Elec. Co. v. Yost Elec. Mfg. Co. (D.C.) 208 F. 719, 723; Dwight & Lloyd Co. v. Greenawalt (D.C.) 20 F.(2d) 533, 535; Wilkie v. Manhattan Co. (D.C.) 8 F.(2d) 785, 788.

*Lack of Invention.*—In my opinion the defense of the invalidity of the plaintiff's patent arising from lack of invention in view of the prior art is also made out. The most important purpose of the plaintiff's device is described in the specifications, page 1, line 18, in this way: "A further object of my invention is the providing a simple, substantial and cheap method of hauling boats out of water." The specifications proceed to describe the apparatus as a whole including the power plant for hoisting and lifting and the method of the whole operation of hauling a vessel out of the water and thereafter scrapping it. But it is to be importantly noted that the claims are only two in number and much more limited in scope than would otherwise be indicated by the specifications. This is due to the cancellation of all of the claims as originally filed in the patent application and substituting the two allowed, which read as follows:

"1. An apparatus for drawing floating bodies out of the water, consisting of an inclined way, tracks thereon, and a series of connected and spaced rollers traveling thereon *upon which rollers the floating body directly rests, and upon which it travels.*

"2. An apparatus for drawing floating bodies out of the water, consisting of an inclined way, tracks thereon, a series of differential rollers the smaller diameters of which roll on said track *and upon the larger diameter of which the said body is rolled.*"

I have underlined the only phrase in each of these claims which, by any possibility, could be regarded as novel in view of the prior art. It will be apparent therefrom that the essence of the patent claims is the idea of placing the ship directly on and to be supported by the rollers instead of on a cradle which in turn rests upon the rollers. The only possible novelty in the plaintiff's patent as compared with the former art is therefore the mere elimination of the cradle. In no other important respect does the operation of the plaintiff's device differ from the ordinary marine railway which had been long in use and was indeed described in the British patent to Summers & Day in 1884, No. 5608, to be found in Defendant's Exhibit B. And, with the exception of the presence of the cradle the plaintiff's patent device is substantially described in United States Patent No. 41,426 issued to Edwards in 1864 for an improvement in marine railways, and particularly in the printed drawings thereof, an enlargement of which, (and as originally filed in the Patent Office) constitutes Defendant's Exhibit C in this case. [2] And of course the use of rollers as the means for moving heavy objects from place to place was a very old and familiar mechanical device long known and frequently used in the moving of houses and other heavy structures, and in hauling boats out of the water. See Hendy v. Miners' Iron Works, 127 U.S. 370, 375, 8 S.Ct. 1275, 32 L.Ed.

---

[2] The invention claimed by Edwards is different from that claimed in the patent in suit. But the Edwards specifications and drawings are important, in showing what was even then well known in the art. The defendant has put in evidence a model of the apparatus shown in the Edwards drawings. The plaintiff objects thereto on the ground that the model does not conform to the drawings in respect to the motion of the cradle on the rollers, relative to the side frames which space the rollers and prevent their lateral motion on the rails. The plaintiff's expert, Stauffen, says the side frames move *en bloc* with the cradle, and thus differ from his patent, but, after careful comparison of the model and the Edwards drawings and, reading the transcribed testimony of Stauffen and comparing his reasons with the testimony of the defendant's expert Morse, I conclude the latter is right; that is, that the cradle and side frames have relative motion, not moving integrally because affixed together. But I do not regard the dispute as very important in view of the whole evidence as to the prior art.

207. Nor is there anything new in the use of the so-called "differential rollers" referred to in the second claim of the Stauffen patent. They are shown in the drawings of the Edwards patent and a special form of application thereof is shown in United States Patent No. 731,292 to Dunwald for railway construction. And the use of rollers for support of and moving the cradle which in turn supports the ship to be hauled out of the water is shown in the patent to Devold No. 893,610, July 21, 1908. None of these patents were cited in the Patent Office. And the use of rollers for a marine railway is also shown in the patent to Clark, No. 1,316,831, September 23, 1919, which was cited by the Patent Office.

The differential roller is simply a roller which in parts is of different diameters. As used in the apparatus of both plaintiff and defendant, the middle part of the roller is of larger diameter than the ends and in operation the ends (of smaller diameters) rest and roll upon the rails while the bottom of the ship rests and rolls upon the larger diameter. The practical value of this arrangement is that the ship advances up the ways faster than the rollers themselves advance upon the rails by reason of the larger circumference of that portion of the rollers upon which the ship directly rests. This gives the added advantage in operation of a shorter runway and less rollers and results in the more rapid advance of the ship than the rollers themselves, thus contributing to economy in construction of the marine railway and economy of operation in the hauling out process. A subordinate but important detail of construction consists in "chamfering or curbing" of the portion of the rollers of larger diameter so that they, as described in the plaintiff's patent specifications, page 1, line 60, "more nearly fit the average bilge of vessels intended to be hauled thereon," and thus also do not tend to cut the bottom of the ship. The weight of a large ship is of course very great and the rollers have to be made of iron. There is no novelty in this construction of the rollers and indeed this feature was not embraced in the patent claims allowed, that one in the application relating thereto having been cancelled, as appears from the file wrapper.

The specifications in the plaintiff's patent start out by stating the object of the invention to be an "improved system of cutting up vessel hulls especially that part ordinarily below the water line." The claims of the patent however as already indicated, are strictly limited to the apparatus for hauling a ship out of the water, and it may be observed that the plaintiff's patent is not really for an *improvement* in the proper sense for a marine railway but rather for a more economical form of apparatus suitable for the limited purpose of hauling out ships *which are to be scrapped*. If valuable ships are to be repaired and preserved for future use, the plaintiff's device is quite unsuitable. The largest ship which has so far been handled on the plaintiff's apparatus is one of about 450 feet in length and about 5,000 tons capacity. The patented apparatus thus has no advantages over, but on the contrary disadvantages as compared with, the ordinary marine railway. Everything that can be done by the plaintiff's modified marine railway can be done much better and more efficiently by the ordinary marine railway which is unsuitable for use only by reason of its greater cost. It seems apparent, therefore, that the plaintiff's idea consists wholly in the construction of a marine railway which will be relatively cheap in construction and operation and suitable for use only on such rough work as is contemplated for the demolition and not the repair, of ships.

In substance, all that the plaintiff has done is to construct a cheap form of marine railway using only well known features of construction and operation with some minor adaptation for the particular use, the only substantial change being the elimination of the cradle. In this respect it is true the plaintiff's construction departed from former customary use but the idea of the elimination of the cradle, disregarding entirely the testimony as to the Copenhagen use, was a very simple one which occurred to Stauffen almost immediately upon his instructions from Mr. Sterrett. That is to say, Sterrett instructed Stauffen to devise and construct a cheap form of marine railway which would be sufficient for hauling out of the water ships that were to be scrapped. And Stauffen, a competently educated engineer, immediately thought of the lighter and more economical form of construction which would eliminate the necessity of using a cradle and in substitution therefor support the ship directly upon the rollers. The idea was so natural to any engineer in

view of the prior known art of moving heavy bodies that he had no difficulty in one evening in sketching out the essence of the apparatus which was subsequently patented. This was far from rising to the dignity of invention and was merely the application of such engineering and mechanical knowledge as readily occurred to a skilled mechanic or engineer. This is not a case where there was a long felt want for a particular service. The business in importance was new, and the need for the new system was at once apparent and quickly supplied by the exercise of ordinary mechanical skill. It did not involve patentable invention.

■■■ In final analysis, what Stauffen did was merely to omit one element (the cradle) of a well known combination of elements constituting the ordinary marine railway at the same time eliminating the function (insuring safety and stability of valuable ships under repair) and the added efficiency of the omitted element. It is well established patent doctrine that such an omission does not constitute that quality of invention required in the patent law where, as here, the remaining elements perform the same function as before, that is, hauling out the ship. See Richards v. Chase Elevator Co., 159 U.S. 477, 486, 16 S.Ct. 53, 40 L.Ed. 225; In re Fry (Cust. & Pat.App.) 54 F.(2d) 433; In re Trester (Cust. & Pat.App.) 36 F.(2d) 133; Anchor Cap & Closure Corporation v. Linhardt et al., 56 F.(2d) 542, 543 (C.C.A. 8); In re Morgan (Cust. & Pat.App.) 64 F.(2d) 991, 992; In re Wickersham (Cust. & Pat. App.) 75 F.(2d) 214; Rivise and Caesar, Patentability and Validity, § 140. The grant of the patent of course carries with it a presumption of its validity which, however, is much weakened in the particular case by the failure of the Patent Office Examiner to cite the important prior patents which have been already mentioned. See International Flatstub Co. v. Young & Selden Co., 284 F. 831 (C.C.A. 4); Gulf Smokeless Coal Co. v. Sutton, 35 F.(2d) 433, 437 (C.C.A. 4); Chisholm-Ryder Co. v. Buck (D.C.) 1 F.Supp. 268, 278, affirmed 65 F.(2d) 735 (C.C.A. 4). The early Edwards patent of 1884, No. 41,426, which was not cited by the Patent Office is really a complete anticipation of the Stauffen patent except for the presence in the former of the feature of the cradle, the mere omission of which cannot be regarded as patentable invention. I therefore reach the conclusion that the patent in suit must be held invalid for lack of invention by reason of the state of the prior art.[3]

It results that the plaintiff's bill must be dismissed with taxable court costs allowed to the defendant. Counsel may present the appropriate form of decree.

---

[3] There seems to have been but a brief consideration of the case in the Patent Office. The original patent application contained nine claims. The first action by the Patent Office was to require division because some claims were for a method and the other for an article. And the Patent Examiner referred to four patents (all being other than those above mentioned) as revealing the pertinent art. To this the applicant's attorney replied erasing four of the claims and adding "neither of the references cited seems to have any bearing on the claims as remaining of record, as neither of them has differential rollers or floating bodies directly contacting with the roller members." The Patent Examiner then rejected all the remaining claims by his letter of May 13, 1924, which read as follows:

"The following patents are now made of record:

"Clark, 1,316,831, Sept. 23, 1919 (61–67);

"German patent to Goldschmidt, 362,-130, Oct. 24, 1922 (61–67) (2 sheets);

"Stucki, 1,477,195, December 11, 1923 (64–64).

"The patent to Clark is cited to show that it is old to pull a ship out of the water on a platform which is in contact with the rollers of a truck.

"The German reference shows that it is old to transport ships on a roller way in which the ship comes in direct contact with the rollers. It would not appear to be invention to cause the ship to come in direct contact with the rollers in such a device as Clark, if protection to the ship's hull were deemed unnecessary.

"Each of the claims is rejected on Clark, in view of the German reference.

"The patent to Stucki is cited to show a roller bearing having conformation quite similar to applicant's roller."

The next day, May 14, 1924, the applicant's attorney, after an interview with the Examiner concerning the latter's letter and the references cited, erased all prior claims and substituted the two that were allowed with a third which seems to have stressed the differential feature of the rollers. His argument was this: "The reference Clark has no cradle. The reference Slacki (Stucki) has conical rolls operating entirely different from ap-

Plaintiff's counsel has submitted requested findings of fact and conclusions of law. These have all been covered, either affirmatively or negatively, in the opinion. Many of the fact findings and most of the conclusions of law requested are directly inconsistent with the view of the case taken in this opinion. The requested findings are therefore denied to the extent that they are inconsistent with the opinion, with exception, if any needed, reserved for the plaintiff.

plicant with a limited movement. The German reference has no ways or track thereon."

The Examiner rejected claim 3 as being indefinite and also because met by cited patents, adding: "Each of these references show movable differential rollers for conveying purposes." But he allowed claims 1 and 2 and claimant's attorney promptly erased claim 3 and the patent then issued in due course.

It is not apparent why claims 1 and 2 were allowed by the Examiner in view of the references that he had made and his interpretation thereof particularly in his letter of May 13. Possibly his differentiation may have been in the clause in that letter reading: "if protection to the ship's hull were deemed unnecessary." It appears in this case that the rollers must be shaped so that they will not cut through the hull while under water even though the ship is to be scrapped. This requirement was met by chamfering the circumference of the larger diameter of the rollers, but this was not a patentable feature and the original claim 9 covering it was cancelled.