## UNION SHIPBUILDING CO. v. BOSTON IRON & METAL CO.
### No. 4203.

Circuit Court of Appeals, Fourth Circuit.
Jan. 4, 1938.

Clifton V. Edwards, of New York City (Gaylord Lee Clark, of Baltimore, Md., on the brief), for appellant.

Herbert A. Baker, of Boston, Mass. (Morton H. Rosen, of Baltimore, Md., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This suit for patent infringement relates to United States patent to Stauffen No. 1,-500,282 issued July 8, 1924, upon an application filed March 4, 1924, for a hauling out system for scrapping vessels and apparatus for the same. Union Shipbuilding Company, assignee of the patent, complained of infringement by Boston Iron & Metal Company, but the bill was dismissed by the District Court, 17 F.Supp. 318, 324, on the ground that the owner of the patent was estopped from enforcing it against the defendant and also on the ground that the patent was invalid for lack of invention in view of the prior art.

The patent relates to means for hauling out the hulls of large vessels in order that they may be cut into plates of suitable size, usually by an acetylene torch. The cost of the operation is of especial importance since the material is sold as scrap. Prior to Stauffen, the custom was to use such devices as a marine railway or a graven or floating dock. Such a railway comprises rails extending far out into the water at a small incline and a cradle running upon rollers upon the rails and adapted to support the vessel while it is being drawn out of the water and repaired. The cradle is a substantial timber structure moved by chains and equipped with keel blocks and bilge blocks to keep the vessel in an upright position. The cradle and its accompanying equipment require a substantial investment of capital and the operation of placing the rollers on the blocks as the boat leaves the water is expensive. The investment in a graven or floating dock is also necessarily large.

The Stauffen method and apparatus were devised to adapt the marine railway to use in scrapping ships by simplifying the equipment and operation so as to diminish the expense. The patent describes two pairs of parallel rails extending out from the shore and upon each pair of rails a number of rollers, separated from each other by side plates in which the rollers

are journaled. The bottom of the vessel rests upon the middle part of the rollers which are chamfered or curved to fit the bilge of the vessel, and the smaller ends of the rollers which rest upon the rails are provided with flanged elements to keep the rollers in line. The ship is floated over the rollers near the end of the railway and is then hauled out, bow first, traveling about three times as fast as the rollers. It will be noted that the bottom of the vessel rests directly upon the rollers so that the usual cradle is eliminated.

The forward portion of the vessel, being sharp, bears more strongly on the inside edge of the curved rollers while the flat or bilge portions bear more strongly on the outside edge. The enlarged part of the rollers serves to bear the sidewise thrust of the load and keep the rollers on the tracks and it also rolls along with the ship at a ratio of travel between it and the ship, depending upon the relative diameters of the two parts of the rollers. The vessel is maintained in an upright position without puncturing the bottom, and the scheme is simpler and less expensive than the ordinary marine railway because the expense of the construction and operation of the cradle is avoided.

The claims in suit, infringement of which is admitted, are as follows:

(1) An apparatus for drawing floating bodies out of the water, consisting of an inclined way, tracks thereon, and a series of connected and spacer rollers traveling thereon upon which rollers the floating body directly rests, and upon which it travels.

(2) An apparatus for drawing floating bodies out of the water, consisting of an inclined way, tracks thereon, a series of differential rollers, the smaller diameters of which roll on said track and upon the larger diameter of which the said body is rolled.

The facts upon which the defense of estoppel rests are as follows: The business of scrapping steel vessels was not at all common until 1922–23, when the surplus of shipping remaining from the World War was fully realized. In 1923 the metal company purchased a large number of vessels for scrapping, and having no suitable plant for the work, entered into a contract with the shipbuilding company on April 20, 1923, to do the work for it, the metal company acting through Morris Schapiro, and the shipbuilding company through one Sterrett, their respective presidents. Sterrett instructed Stauffen, the patentee, who was an engineer in the employ of the shipbuilding company, to devise, if possible, and construct a more economical system for hauling out and scrapping vessels than was then in vogue. Schapiro testified that he told Sterrett of a method employed by Petersen and Albeck in Copenhagen, of which the essential feature was the elimination of the cradle. Sterrett was dead at the time of the trial, but Stauffen testified that Sterrett did not give him this information. The District Judge accepted the testimony of both witnesses in this respect. Stauffen immediately thought of the method disclosed in the patent and put it into use. The work under the contract was begun in September, 1923, and fully performed.

Several months later, the metal company purchased additional ships, and in November or December, 1923, offered the work to Sterrett; but the price named seemed prohibitive to Schapiro, who thereupon leased a plant in the Baltimore harbor which was provided with the foundation for a marine railway. Thereon the metal company constructed a hauling out system similar to that of the shipbuilding company and used it for the first time in September or October, 1924, after the grant of the patent. The plant was inspected by officers and employees of the shipbuilding company, and figures were submitted to Sterrett which were considered to be a reasonable royalty that Schapiro might be expected to pay. But no notice of the patent was given to the metal company, and no demand for the payment of royalty was made. Several ships were scrapped by the metal company at its own plant in 1924, but later the work at this place was abandoned and a new contract was made with the shipbuilding company, which did all of the defendant's work until 1928.

In 1929 Sterrett informed Schapiro, who desired to continue the arrangement between the companies, that the shipbuilding company had bought forty-five vessels to be scrapped on its own account and that it needed the exclusive use of its plant. With this situation in view, Sterrett suggested that Schapiro reinstall the plant which he had erected in 1924 and do his own work. Schapiro thereupon re-equipped and extended the old plant at the expense of $40,000, and between 1929 and 1933 de-

molished thirty ships, working under pressure during the last year of this period. No complaint or protest was received from the owner of the patent until November 22, 1933, after the retirement and death of Sterrett, when the shipbuilding company sent a notice to the metal company demanding payment of royalties for the use of the infringing device both in the past and in the future. Payment being denied, the pending suit was instituted in September, 1935.

The District Judge made the finding of fact, and the evidence supports the finding that the owner of the patent, although possessed of full knowledge of its infringement for a short period in 1924 and again during the extended period from 1929 to 1933, made no protest and did not even communicate to the infringer the fact that a patent on the modified marine railway had been issued; and, moreover, that the president of the shipbuilding company invited the re-establishment of the infringing structure in 1929, so that, even if the infringer knew of the existence of the patent, an implied license to use it might reasonably have been inferred. These facts warrant the legal conclusion of the court that the defense of laches and estoppel had been made out and that the owner of the patent had thereby forfeited any right it might otherwise have had not only to an accounting for past infringement, but also to an injunction prohibiting the use of the patented apparatus by the defendant in the future. Wolf Mineral Process Corporation v. Minerals Separation North American Corporation., 4 Cir., 18 F.2d 483, 490; Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., 3 Cir., 284 F. 645; Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 3 Cir., 64 F.2d 185; Meyer Mfg. Co. v. Miller Mfg. Co., 7 Cir., 24 F.2d 505, 508.

We are also in accord with the conclusion of the District Court that the patent is invalid for lack of patentable invention. The only substantial change made by Stauffen in the form of marine railway commonly in use was the elimination of the cradle. The claims of the patent demonstrate this fact, in that they describe an apparatus for drawing floating bodies out of the water wherein the vessel directly rests and travels upon rollers, described as differential rollers, a well-known device, in the second claim of the patent. It is in this respect only that the claims of the patent disclose any novelty. It is quite clear that the new method was meritorious in the savings which it effected; but the evidence shows quite clearly that, as soon as the desirability of an economical method of scrapping ships became apparent, it was easily and quickly found by one familiar with marine railways and their methods of operation. Stauffen himself testified that, after having been instructed by Sterrett to find the solution, he developed it at home one Friday night, put it in practice the next morning on the drawing board and showed it to Mr. Sterrett; that he then worked on it Saturday and Sunday and by Monday morning had worked it out in detail. As said in the opinion of the District Judge:

"The idea was so natural to any engineer in view of the prior known art of moving heavy bodies that he had no difficulty in one evening in sketching out the essence of the apparatus which was subsequently patented. This was far from rising to the dignity of invention and was merely the application of such engineering and mechanical knowledge as readily occurred to a skilled mechanic or engineer. This is not a case where there was a long felt want for a particular service. The business in importance was new, and the need for the new system was at once apparent and quickly supplied by the exercise of ordinary mechanical skill. It did not involve patentable invention."

For these reasons, the bill of complaint was properly dismissed both on the ground of laches and estoppel and also on the ground of the invalidity of the patent. The decree of the District Court is therefore affirmed.