126

VICTORY FIREWORKS & SPECIALTY
CO. et al. v. COMMERCIAL
NOVELTY CO.
No. 2449.

District Court, D. Maryland.
Jan. 21, 1939.

William Pepper Constable, of Baltimore, Md., and Nathan Heard and Frederick A. Tennant, both of Boston, Mass., for plaintiffs.

William H. Hudgins, of Baltimore, Md., Joshua R. H. Potts, of Chicago, Ill., Basel H. Brune, of Philadelphia, Pa., and Eugene V. Clarke, of Chicago, Ill., for defendant.

CHESNUT, District Judge.

In this patent infringement suit in equity an interlocutory decree was filed December 16, 1936, holding that the plaintiffs' patent sued on was valid and had been infringed by the defendant; that an injunction should issue against continued infringement; and referring the case to W. Ainsworth Parker, as special master, to take and state an account of profits and damages from past infringement. The accompanying opinion, including findings of fact and conclusions of law, is reported in D.C., 16 F.Supp. 969. An appeal was taken by the defendant resulting in an affirmance of the decree, reported in 4 Cir., 92 F.2d 299.

In due course after the affirmance the accounting proceeded before the special master and his extended report of 48 typewritten pages was filed November 15, 1937. Both parties have filed objections to the conclusions of the master which, briefly stated, were that the complainants had failed to submit sufficient proof for an estimate of damages, but that the defendant's profits to which the plaintiff was entitled amounted to $15,525.57.

The clear and comprehensive report of the master shows with what thoroughness he has considered the very voluminous testimony taken by the parties on the accounting and his full consideration of all the points of law involved in the proceeding. Rule 53(e)2 of the new federal rules of civil procedure, 28 U.S.C.A. following section 723c, provides that "in an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. * * * The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or

may recommit it with instructions." This rule is in substance former general equity rule 61½, 28 U.S.C.A., following section 723. The objections of the parties to the report have been argued very extensively both orally and in briefs. After consideration, I am of the opinion that the report should be confirmed except on two points.

■ I. *As to the defendant's 1937 torpedoes.* The master concluded that these infringed the patent and were therefore within the scope of the accounting. But as a result of the argument of counsel and a close examination of the formation and structure of what was said at the hearing to be a sample of the 1937 torpedoes, and particularly after taking one of them apart and noting the construction, I find that they are in my opinion not an infringement of the plaintiffs' patent. A reference to the opinion of this court and the reasons for the affirmance thereof given by the Circuit Court of Appeals will show that the essence of the plaintiffs' patent consists in the outer shell of the torpedo formed by the agglutination and agglomeration of particles of sawdust on and around an inner capsule containing the explosive ingredients; the whole forming a spheroidal or globular torpedo; or, as said at page 970 of 16 F.Supp., "the gist of the patent lies in the outer shell and not in the inner capsule". It was in this particular of the built-up shell that the legal distinction was found between the plaintiffs' patent and the alleged anticipatory patent of Graber. At page 973 it was said: "It would seem evident that the formation of the encasing shell requires the adhesion of a number of separate layers of the granules of sawdust one upon the other around the cartridge." As appeared at the recent hearing from visual demonstration the thickness of the encasing shell of the plaintiffs' torpedoes made under the patent is approximately three-sixteenths to one-quarter of an inch. The defendant's torpedoes as made *in 1936,* a sample of which was produced and carefully examined at the recent hearing, showed a variation from the plaintiffs' principally in the final shape which was cylindrical rather than spherical, and the thickness of the encasing shell of sawdust and agglutinate was somewhat less than the plaintiffs' torpedoes, but otherwise they were substantially the same in structure and functional effect. But a critical examination of the defendant's *1937* torpedoes shows a substantially different structure. Instead of using sawdust the defendant has substituted aluminum flakes for the encasing cover of the paper cartridge containing the fulminating compound, and this covering of aluminum flakes does not form what can fairly be termed a shell but rather only a thin water-proof covering. In thickness it is hardly more than a stiff wrapping paper although it is applied after dipping the inner cartridge in an agglutinate bath of silicate of soda and then *once* rolling the cartridge in the aluminum flakes. The thickness of the cover varies at some points although never approximating the nature of the shell of the plaintiffs' manufacture. My attention has been called to the testimony of a chemical witness of the plaintiffs on the accounting to the effect that in the defendant's 1937 torpedo the aluminum flakes superimposed one on the other were 100 to 500 in number. This would seem not to be accurate as applied to the specimen 1937 torpedo exhibited to and examined by me at the hearing. I can only conclude that the witness must have been testifying with regard to a torpedo which was not a fair sample of those exhibited to the court. I find that the defendant's 1937 torpedoes were not an infringement of the plaintiffs' patent. In reaching the contrary conclusion the special master of course did not have the benefit of hearing the testimony in the original proceeding in this case. The process of manufacture of the 1937 torpedo as described in the testimony also varies from the plaintiffs' method of manufacture under its patent, which was described with some particularity in the original opinion. The defendant's 1937 torpedo is in principle not materially different from the Graber patent. As the defendant made no net profit in 1937 on the basis of its cost accounting, for the torpedoes sold in that year, the question as to the 1937 torpedo is not important on the accounting if the defendant's cost, now to be discussed, was proper.

■ II. The only other point on which I am in disagreement with the master is with regard to that feature of the defendant's *cost accounting* which involved the *allocation* of the general *overhead expense* of its business to the manufacture of *torpedoes.* On this point the defendant's books were kept throughout on the basis of allocating overhead expense to what was called "prime cost" of the torpedoes instead of on the basis of "direct labor costs." Prime cost consists of the sum

of direct labor cost plus cost of material. The master, however, after hearing expert testimony from cost accountants reached the conclusion that the better method of cost accounting in a manufacturing plant is to allocate or distribute general overhead expense to the various articles manufactured on the basis of direct labor costs only, and not on prime cost. The difference between the two methods is in effect to considerably decrease the final cost of manufacture, with the allocated overhead, where the direct labor cost for a particular article is proportionately less than in the case of other articles, and where the cost of materials for the particular article and the other articles are approximately the same. In other words, as the ratio of direct labor costs for a particular article declines, the result will be that a smaller proportion of the general overhead expense will be allocated to it.

The different results of the two methods is strikingly illustrated in this case. By the defendant's cost accounting system the net profits amount to $3,978.10; but if general overhead expense is allocated on the basis of labor costs only, as determined by the master, the profits for which the defendant is accountable are made $15,525.57. This very considerable difference at once raises strikingly the question as to the fairness of the application of the master's method of cost accounting contended for by the plaintiffs as applicable to this case; and the query is all the more significant when it is noted that during the whole period of the defendant's corporate existence it has paid no dividends and its accumulated surplus over initial capital at the end of 1936 was only $2,392.48.

In this connection there are also other facts to be borne in mind. The defendant is a wholly owned subsidiary of The Unexcelled Company which is one of the chief factors in the fireworks business in this country. The latter organized the defendant, where some seventeen varieties of fireworks are made, torpedoes being only one of the seventeen. It is said that the accounting system of the defendant was naturally made to conform to that of its parent corporation and that the cost accounting system of the latter for forty years had been based on prime cost. It does not appear that the defendant's bookkeeping system was adopted for the particular purpose of increasing the cost of manufacture of torpedoes but was a general system which applied to all articles of manufacture. It also appears that both systems of allocating overhead, that of the prime cost method and that of the direct labor costs method, are arbitrary and neither is wholly accurate or scientific. While the master was, I think, right in his conclusion that at the present time most factories use the direct labor basis in preference to prime cost, still the rule is not invariably applied and it is recognized that in some situations prime cost is more accurate than direct labor costs. The defendant also points out that there are considerations with respect to its particular business which indicate that prime cost is a more reasonable and accurate system than the direct labor cost method. Even though the direct labor basis may be generally preferable to the prime cost method of allocating general overhead expense, it seems unreasonable to rewrite the defendant's books in this respect, in the absence of evidence that its general method was clearly improper, or failed to fairly reflect the manufacturing cost of its torpedoes in relation to other articles made by it.

There is another very significant consideration which has relation to the determination of profits in this case. There is some evidence which indicates that this type of torpedo is sold by fireworks manufacturers as a "loss leader". The price to the ultimate purchaser seems to be necessarily limited to a maximum of one cent per torpedo. The testimony shows that the manufacturing cost is around forty to forty-five cents per gross, and ordinarily torpedoes are distributed from the manufacturer through a distributor, and a jobber and a retailer, or at least there are two additional profits over and above that of the manufacturer to come out of the ultimate sale price to the consumer. It seems obvious enough that the manufacturer's profit must be at least quite small. And if the torpedoes are in fact handled by the manufacturers as a loss leader, that explains some other facts appearing in evidence in this case.

One such other fact is that at times, although perhaps not as a general policy, the plaintiff declined to sell its torpedoes to dealers in fireworks unless they would at the same time buy other fireworks. This testimony is used by the defendant as a complete defence to all liability for accounting in a connection which will be later mentioned. Still another fact in this connection is that the plaintiff having orig-

inally at the outset of the accounting claimed approximately $80,000 as damages, has abandoned that issue after the master found insufficiency of evidence as a basis for computing damages, due very largely to lack of satisfactory proof by the plaintiff as to its own cost of manufacture, in comparison with the sale price; or in other words, the plaintiff did not satisfactorily establish by testimony that it was making a profit on this article.

There is still another point that must fairly be considered in connection with the amount of the profits. The plaintiffs' principal and only argued objection to the master's findings and conclusions is that the amount of the profits, instead of being $15,525.57, should have been $61,-615.86. This contention is based on the evidence that the defendant sold about 90% of its torpedoes to its parent, The Unexcelled Company, at a price much less than the defendant's selling price to independent dealers. The plaintiffs therefore contend that the sale price to these other dealers should be used as the sale price also to The Unexcelled Company in the computation of profits. The plaintiffs have however not submitted any evidence as to the profits, if any, made by The Unexcelled Company in its resales of torpedoes; and when plaintiffs' counsel was asked if he would suggest a re-reference to the master on this point he stated that he thought nothing would be accomplished thereby. As the defendant is a wholly owned subsidiary of The Unexcelled Company, the fairness of the sale price to its parent is properly to be critically scrutinized. But the master held after full consideration that under all the facts the sale price to The Unexcelled Company was fair and reasonable. And I find no reason to think that his conclusion on the facts was wrong.

It is not necessary to discuss in detail all the other points considered and passed upon by the master but some brief comment may be made as to two of them. Laches and estoppel are now for the first time in this case urged against any liability for accounting. These defenses were not pleaded by the defendant in its answer in the case and were not urged at the original trial as a defense either to injunction or accounting, although the facts now relied on were substantially all developed on the original hearing. The defendant contends that one important fact was only subsequently discovered or fully realized but in my opinion it must or should have been known to the defendant long ago. I find no element of real estoppel in this case, and it is very doubtful indeed if the laches now set up would have been a sufficient defense even to the accounting if they had been timely advanced. In the recent opinion by Judge Parker in the case of Hartford-Empire Co. v. Swindell Bros., 4 Cir., 96 F.2d 227, a patent infringement case, it was said on this point at page 233:

"The statute, since the amendment of March 3, 1897, § 6, 29 Stat. 694, limits the recovery of profits and damages to those arising from infringements committed within six years prior to the institution of suit, 35 USCA, § 70, and we know of no other period of limitations which can be invoked by an infringer to bar recovery. Where there are circumstances which render it inequitable for relief to be granted because of delay in instituting suit, relief may be denied on ground of laches or estoppel; but no such circumstances are shown here. It is well settled that mere delay short of a statutory period of limitations is not sufficient of itself to bar relief. As was well said by the late Judge Walter H. Sanborn in Drum v. Turner, 8 Cir., 219 F. 188, 198: 'It is no defense to a suit for an injunction and an accounting on account of the continuing trespasses of an infringer that the latter has been trespassing on the rights of the owner of the patent for years with impunity.' "

The doctrine of laches and estoppel in patent infringement cases was also quite fully discussed in Union Shipbuilding Co. v. Boston Iron & Metal Co., D.C., 17 F. Supp. 318; Id., 4 Cir., 93 F.2d 781. There is nothing here equivalent to the laches and estoppel involved in the latter case.

The defendant also urges that the plaintiffs should be barred from relief by the doctrine of unclean hands. It bases this contention on the testimony already referred to that in some cases, although not as a general policy, the plaintiffs refused to sell torpedoes to purchasers unless the latter would also buy at the same time other fireworks. It is urged that this was an effort to abuse a patent monopoly under the doctrine of Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, and Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819;

**130**

but on examination of these cases I do not find the situations sufficiently similar to warrant the defense here made. Other attempted applications to this case of the doctrine of unclean hands have been so fully considered and disposed of by the master that it is unnecessary to submit further comment thereon.

Except on the two points above mentioned the master's report should be confirmed. It is probable that counsel can now agree upon the form of decree to be signed including the final sum for which the defendant must be held accountable for profits. If counsel can so agree, a decree in accordance herewith may be submitted. If they cannot agree, there will probably have to be a re-reference of the case to the master to compute the profits in accordance with the principles herein announced.

█ As to costs, the defendant contends that they should be wholly placed upon the plaintiffs, or at least divided, because it is said the plaintiffs have unduly protracted the accounting and made it unnecessarily burdensome, by loose and carelessly prepared data to support large claims for damages and profits, with the result that the claim for the former, involving a large part of the testimony has been now abandoned by the plaintiffs. As there seems to be reasonable basis for this contention, the costs on the accounting will be divided between the parties.